# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 4, 2021    Decided January 21, 2022

No. 20-1470

INTERCONTINENTAL EXCHANGE, INC., ET AL.,
PETITIONERS

v.

SECURITIES AND EXCHANGE COMMISSION,
RESPONDENT

On Petition for Review of a Final Order
of the Securities and Exchange Commission

*Kelly P. Dunbar* argued the cause for petitioners. With him on the briefs was *Amy Lishinski.*

*Jeffrey A. Berger*, Senior Litigation Counsel, Securities and Exchange Commission, argued the cause for respondent. With him on the brief were *Michael A. Conley*, Acting General Counsel, and *Tracey A. Hardin*, Assistant General Counsel.

*Keith Bradley* was on the brief for *amicus curiae* Bloomberg L.P. in support of respondent.

*James A. Brigagliano* and *Eric D. McArthur* were on the brief for *amici curiae* McKay Brothers LLC, et al. in support of respondent.

*Jason M. Halper* was on the brief for *amici curiae* Securities Industry and Financial Markets Association and FIA Principal Traders Group in support of respondent.

Before: KATSAS and WALKER, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* GINSBURG.

GINSBURG, *Senior Circuit Judge*: Five registered national securities exchanges filed proposed rules with the Securities and Exchange Commission to establish fee schedules for two wireless services: Wireless Bandwidth Connections, which connect a customer's equipment located on the premises of a petitioner exchange with the customer's equipment located on the premises of a third-party data center; and Wireless Market Data Connections, which connect a customer to the proprietary data feed of a petitioner exchange. The exchanges filed the rules only because SEC staff had informed them that the Commission views their wireless services as "facilities of an exchange" and therefore subject to its jurisdiction. The SEC's Final Order asserted jurisdiction over the services and approved the proposed rules.

The exchanges, their common corporate parent, and three other corporate affiliates petitioned for review of the Final Order, arguing that (1) the SEC's assertion of jurisdiction over the services was based upon an erroneous interpretation of the statutes that define "exchange" and "facility," (2) the SEC arbitrarily and capriciously ignored the effect of the Final Rule upon the ability of the wireless services to compete, and (3) the SEC unlawfully ignored Commission regulations defining "exchange" and arbitrarily and capriciously departed, without acknowledgment and explanation, from relevant agency

precedents. We reject each of these arguments and therefore deny the petition for review.

## I.     Background

Before describing the factual and procedural background giving rise to this petition for review, we first lay out the statutory framework for the filing of rules by self-regulatory organizations and then describe some relevant characteristics of the modern securities market.

## A.  Statutory Framework

As a "self-regulatory organization," or SRO, a national securities exchange must file with the SEC any proposed rule or rule change. 15 U.S.C. §§ 78c(a)(26), 78s(b)(1). For a rule to be approved by the SEC, it must, among other requirements, "provide for the equitable allocation of reasonable dues, fees, and other charges among . . . persons using its facilities," "promote just and equitable principles of trade," and not "impose any burden on competition not necessary or appropriate in furtherance of the purposes of [the Securities Exchange Act of 1934].". *Id.* § 78f(b)(4),(5),(8).

Section 3(a) of that Act defines "exchange" as

> any organization, association, or group of persons . . . which constitutes, maintains, or provides a market place or facilities for bringing together purchasers and sellers of securities or for otherwise performing with respect to securities the functions commonly performed by a stock exchange.

15 U.S.C. § 78c(a)(1). The statute specifically provides that an "exchange" includes not only the marketplace but also "the market facilities maintained by such exchange." *Id.*

Section 3(a)(2) clarifies that

> [t]he term 'facility' when used with respect to an exchange includes its premises, tangible or intangible property whether on the premises or not, any right to the use of such premises or property or any service thereof for the purpose of effecting or reporting a transaction on an exchange (including, among other things, any system of communication to or from the exchange, by ticker or otherwise, maintained by or with the consent of the exchange), and any right of the exchange to the use of any property or service.

*Id.* § 78c(a)(2).

## B. The Modern Securities Market

Securities exchanges, and the market for securities, have undergone a sea change since passage of the Exchange Act in 1934. Once non-profit and member-owned, exchanges now are mostly for-profit companies. Trading is overwhelmingly automated and electronic; the once iconic trading floor has gone the way of the nickel beer. Exchanges now rely upon highly sophisticated technologies and matching algorithms to perform core functions, such as matching buy and sell orders, while brokers and traders rely upon lightning-fast technology to generate, route, and execute orders.

5

As the market for securities has evolved, speed has become increasingly important to sophisticated and successful securities trading strategies, as vividly recounted in the popular book "Flash Boys" by Michael Lewis. Speed here is measured in microseconds (millionths of a second) and nanoseconds (billionths of a second). These miniscule fractions of a second — utterly meaningless virtually everywhere else — can make all the difference when it comes to receiving market data and completing a profitable transaction. *See* Market Data Infrastructure, 85 Fed. Reg. 16726, 16728 (proposed Mar. 24, 2020) ("Today, the U.S. equity markets have evolved into high-speed, latency-sensitive electronic markets where . . . even small degrees of latency affect trading strategies. Sophisticated order routing algorithms dependent on low-latency, high-quality market information are widely used to execute securities transactions."). It should come as no surprise, then, that sophisticated market participants continually seek to reduce the latency in their transmissions.

The array of services a modern securities exchange offers to market participants reflects these realities. Among them is co-location. A market participant rents rack space and places its servers in physical proximity to an exchange's matching engine or its proprietary market-data feed. The idea is simple: the closer a trader or broker's equipment is to a market-data feed, the sooner it can receive market data and then act upon it; and the closer this equipment is to a matching engine, the faster an order can be routed to that matching engine. Exchanges also charge for access to proprietary market-data feeds and for various connectivity services, such as access to local networks that connect to matching engines.

## C. Factual and Procedural Background

The petitioners are Intercontinental Exchange, Inc. (ICE) and eight of its wholly owned subsidiaries. Through its subsidiaries, ICE operates securities exchanges and clearing houses and provides data services. Five of the eight petitioning subsidiaries — New York Stock Exchange LLC, NYSE American LLC, NYSE Arca, Inc., NYSE Chicago, Inc., and NYSE National, Inc. (the Exchanges) — are for-profit firms registered with the SEC as national securities exchanges. The other three — ICE Data Services Wireless LLC, NYSE Technologies Connectivity, Inc., and ICE Data Connectivity & Feeds, Inc. (collectively, ICE Data Services, or IDS) — operate a global connectivity network that provides access to global markets and data sources. One of the data services affiliates — NYSE Technologies Connectivity, Inc. — is a subsidiary of the New York Stock Exchange. *See* Figure 1.

Figure 1: Corporate Structure of Intercontinental Exchange, Inc.



The technological infrastructure of the Exchanges, including their matching engines, is housed in a 400,000 square foot building in Mahwah, New Jersey, at which the Exchanges offer co-location services, as well as connectivity services for customers' co-located equipment. The NYSE and others have routinely filed rules regarding these various services for SEC approval. *See, e.g.,* Self-Regulatory Organizations; New York Stock Exchange LLC; Order Approving a Proposed Rule Change Amending its Price List to Reflect Fees Charged for Co-Location Services, 75 Fed. Reg. 59310 (Sept. 2010); Self-Regulatory Organizations; New York Stock Exchange LLC; Notice of Filing of Partial Amendment No. 4 and Order Granting Accelerated Approval of a Proposed Rule Change, as

Modified by Amendment Nos. 1 Through 4, to Amend the Co-Location Services Offered by the Exchange To Add Certain Access and Connectivity Fees, 82 Fed. Reg. 15741 (Mar. 2017).

In January 2020 the Exchanges filed with the SEC proposed rule changes establishing fee schedules for two wireless connectivity services operated by IDS. Each of the five NYSE Exchanges filed two proposed rule changes, one for each of the two services. One service (Wireless Market Data Connection) enables a market participant to transport proprietary market data (sold separately by the Exchanges to market participants), including information regarding bids, offers, and trades, from the Exchanges' facility in Mahwah to the market participant's co-located equipment at data centers in Secaucus, New Jersey, (operated by the Cboe exchange group), Carteret, New Jersey (operated by the Nasdaq exchange group), or Markham, Ontario (operated by Canadian exchanges). More specifically, as shown in Figure 2, the proprietary data first travels via fiber connections from an Exchange's matching engine to co-located IDS equipment and onward to a data pole; the data then travels wirelessly through a series of towers until it reaches a data pole at a third-party data center; finally, the data travels via fiber connections to IDS equipment and then to a market participant's equipment.

Figure 2: Wireless Market Data Connections



The other service (Wireless Bandwidth Connection) provides a two-way connection that enables a customer's co-located equipment at the Mahwah data center to communicate with the customer's co-located equipment at a third-party data center. At both ends of the connection, IDS equipment connects by fiber to the market participant's co-located equipment. Because a Wireless Bandwidth Connection runs both ways, a market participant can send a buy or sell order from Mahwah to a third-party data center, or vice versa. The Wireless Bandwidth Connection itself, however, does not connect a market participant's co-located equipment directly to the Exchanges' matching engines; in order to make this final connection, a market participant must purchase another connectivity service. *See* Figure 3.

## Figure 3: Wireless Bandwidth Connections



IDS contracts with a non-ICE firm to provide wireless connections between Mahwah and the data centers in Secaucus and Carteret. These wireless connections use as their distribution point a data pole next to the Exchanges' facility in Mahwah, to which IDS has exclusive access. *See* Figure 4.

Figure 4:  Mahwah Data Center[1]



For the connection between Mahwah and Markham, by contrast, IDS uses its own wireless network, and no private pole is involved.  Non-ICE firms, such as amici McKay Brothers, LLC and Quincy Data, LLC, offer competing connectivity services between Mahwah and the other two New

---

[1] This figure is taken from the brief of amicus curiae McKay Brothers LLC, Quincy Data LLC, et al.

Jersey data centers, but they are consigned to using a public access pole, as shown in Figure 4.

In their proposed rules, the Exchanges explained that they filed with the SEC only because Commission staff informed them that the Commission viewed the fee schedules as "rules of an exchange." In the view of the Exchanges, however, the Wireless Connections "are not facilities of the Exchange within the meaning of the Act, and therefore do not need to be included in its rules." *See, e.g.,* Self-Regulatory Organizations; New York Stock Exchange LLC; Notice of Filing of Proposed Rule Change to Establish a Schedule of Wireless Connectivity Fees and Charges with Wireless Connections, 85 Fed. Reg. 8938, 8939 (Feb. 2020) (hereinafter Proposed Rule Change).

During the public comment period, several parties argued that the private data pole located on the grounds of the Mahwah data center made the proposed rules burdensome to competition and inequitable because the private pole, to which IDS has exclusive access, is 700 feet closer to the co-located equipment than is the closest public pole, increasing the distance traversed wirelessly and decreasing the distance traversed through fiber connections. Because light waves travel faster through air than through fiber-optic cable, this would meaningfully reduce latency — albeit by less than a microsecond — and thus give IDS an insuperable latency advantage over its competitors. *See* Figure 5.

## Figure 5: Advantage of Access to Private Pole

Mahwah Data Center Premises          Third Party Data Center

Mahwah Data Center Building | Private pole | IDS Wireless Network

IDS equipment

Competitor Equipment

IDS equipment

Competitor Equipment

......... Wireless connection

▬▬ Fiber connection

The Exchanges addressed this concern by amending the proposed rules to ensure that the length of fiber running from the private data pole to IDS's co-located hardware would be equal to the length of fiber running from the closest public access pole to the co-located hardware of competitors, thereby negating the advantage provided by the proximity of the private data pole.

In its Final Order, the SEC affirmed its jurisdiction over the proposed fee schedules for the Wireless Connections and then approved them. Self-Regulatory Organizations; New York Stock Exchange LLC, NYSE American LLC, NYSE Arca, Inc., NYSE Chicago, Inc., and NYSE National, Inc.; Notice of Filings of Partial Amendment No. 3 and Order Granting

Accelerated Approval to Proposed Rule Changes, Each as Modified by Partial Amendment No. 3, to Establish a Wireless Fee Schedule Setting Forth Available Wireless Bandwidth Connections and Wireless Market Data Connections, 85 Fed. Reg. 67044 (Oct. 2020). Intercontinental Exchange Inc., the Exchanges, and IDS petitioned this court for review pursuant to 15 U.S.C. § 78y(a)(1).

## II.    Analysis

ICE argues the SEC's Final Order should be vacated because (1) it is based upon an erroneous, or at least an unreasonable, interpretation of the relevant statutes; (2) the Commission failed to consider the effect of the Order upon competition; and (3) the Order is inconsistent with SEC regulations and departs from agency precedents without adequate acknowledgement and explanation.

## A.  Statutory Interpretation

The SEC concluded the Wireless Connections are subject to its jurisdiction as "facilities of an exchange." This conclusion, the SEC argues, follows from its unambiguously correct reading of the relevant statutes. In the alternative, the Commission says that even if the relevant statutes are ambiguous, its interpretation of the statute is reasonable and entitled to deference. ICE maintains, to the contrary, that the SEC's Final Order is based upon an unambiguously incorrect reading of the relevant statutes, and to the extent there is ambiguity, the SEC resolved it unreasonably.

### 1. Definition of "facility"

Section 3(a)(2), set out above, includes several properties and property rights and services within the statutory definition of a "facility" of an exchange. In its Final Order, the SEC concluded that, for several reasons, both the Wireless Bandwidth Connection and the Wireless Data Connection satisfy the statutory definition of "facility." We agree with the SEC that the Wireless Connections are "facilities" of an exchange because they are "system[s] of communication to or from the exchange . . . maintained by or with the consent of the exchange" that is offered "for the purpose of effecting or reporting transactions on the exchange." 15 U.S.C. § 78c(a)(2).

Start with the Wireless Bandwidth Connection. The statutory definition of facility describes it to a tee: It allows a market participant to transmit data, including price quotes and orders, between the participant's co-located equipment at the Mahwah data center and the participant's co-located equipment at a third-party data center, and thus to effect or report transactions on the Exchanges. Indeed, facilitating market activity is the only reason a market participant would pay a $10,000 initial fee and a recurring monthly charge of up to $45,000 for this connection. *See* Proposed Rule Change, 85 Fed. Reg. at 8942.

The same goes for the Wireless Data Connection. It allows for transmission of proprietary market data, including information about bids, offers, and trades, from the premises of the Exchanges at Mahwah to a market participant's equipment co-located at a data center maintained by another exchange. The market participant may use those data to route orders to the Exchanges. Therefore, a Wireless Data Connection, too, is "a system of communication to or from the exchange . . .

maintained by or with the consent of the exchange" that is offered "for the purpose of effecting and reporting transactions on the Exchange." Indeed, as the SEC aptly argues in its brief, the Wireless Data Connection is the modern analogue of the ticker, which the statute gives as an example of a system of communication that is considered a "facility," *see* 15 U.S.C. § 78c(a)(2).

ICE quibbles with these simple observations. It argues that because the Wireless Connections are not directly connected to the Exchanges (i.e., to the matching engines) and are but a single link in the chain of communication between market participants and the matching engines, they are not systems of communication "to or from the exchange." Further, according to ICE, unless the court "maintain[s] a strict limit on what it means to be to or from, you can quickly end up in a scenario where the SEC could claim the jurisdiction to regulate every antecedent communications link that may eventually lead to a securities transaction . . . ." Oral Arg. Rec. at 15:07-15:25. Taking its point to the extreme, ICE argues the Commission's theory would subject to the Commission's jurisdiction even "telecommunications providers, couriers, or any service used by broker-dealers or others that is somehow related to the later buying and selling of securities on an actual exchange," an absurd result.

ICE's narrow reading of the statute does not withstand scrutiny, and its warning about the dire consequences of a more expansive reading rings hollow. As the petitioners conceded at oral argument, the statutory definition of "exchange" encompasses more than just the matching engine, so there is no reason to think the plain meaning of a system of communication "to or from the exchange" is limited to a system that provides a direct connection to the matching engine of an exchange. Furthermore, ICE's reading of the statue is

formalistic to a fault. True enough, the Wireless Bandwidth Connection does not directly connect a market participant to equipment owned by an exchange; rather it connects the market participant's co-located equipment at Mahwah to the participant's co-located equipment at a third-party data center. Focusing upon this fact alone, however, ignores crucial context. The Wireless Bandwidth Connection serves no purpose other than facilitating market activity, which requires a connection to the matching engine of an exchange. Technically, the Wireless Bandwidth Connection could be used for non-market related communications, but it would make no economic sense to purchase an expensive Wireless Bandwidth Connection for that reason. Unsurprisingly, a market participant that purchases a Wireless Bandwidth Connection invariably purchases a further connection linking its equipment at Mahwah to a matching engine there. *See* McKay Brothers Br. at 15 n.10 ("[*A]mici* are unaware of any trading firm co-located in the Exchanges' data center that does not have a connection for executing orders on the Exchanges' system.")*; see also* Self-Regulatory Organizations; New York Stock Exchange LLC, NYSE American LLC, NYSE Arca, Inc., NYSE Chicago, Inc., and NYSE National, Inc.; Order Granting Accelerated Approval, 85 Fed. Reg. at 67049 (Oct. 2020) ( "What is required for an exchange service to be a facility is that it be provided 'for the purpose of' effecting or reporting a transaction on the Exchange which . . . is in fact the case."). A Wireless Bandwidth Connection, therefore, is a vital and proximate link in a system of communication that directly connects a market participant to the matching engine of an exchange. To analyze the Wireless Bandwidth Connection without regard to the context in which it operates makes no sense.

We are unmoved by ICE's warning about the dire consequences of our reading of the statute. Holding the

Wireless Bandwidth Connection and the Wireless Data Connection qualify as systems of communications "for the purpose of effecting or reporting a transaction on an exchange" will not lead us down a slippery slope that ends in an irrational extension of the SEC's jurisdiction. The differences between the Wireless Connections and, to take ICE's own examples, a telecommunications or courier service used by a broker to communicate with a customer are legion. In contrast to those services, the Wireless Connections are very expensive, highly specialized connections, used exclusively by market participants for the sole purpose of effectuating trading strategies and facilitating market activity. Moreover, they are offered by IDS, an affiliate of the Exchanges, and could not exist without the consent of the Exchanges — in other words, they clearly are "system[s] of communication . . . maintained by or with the consent of the exchange," 15 U.S.C. § 78c(a)(2). Communications systems that incidentally facilitate the trading of securities, by contrast, do not owe their existence to the consent of any exchange, nor are they maintained by any exchange. Finally, a Wireless Bandwidth Connection invariably forms the penultimate link in a direct connection to the matching engine of an exchange. There is thus a country mile between subjecting the Wireless Connections to the jurisdiction of the SEC and subjecting "every antecedent communications link" to the Commission's jurisdiction.

## 2. Section 3(a)(1)

Our analysis does not end with holding the Wireless Connections come within the definition of "facility" in Section 3(a)(2). Both the SEC and the petitioners read Section 3(a)(2) through the lens of Section 3(a)(1). In other words, satisfying the statutory definition of "facility" in Section 3(a)(2) is necessary but not sufficient to subject a facility to the jurisdiction of the Commission; it must also be the type of

facility that Section 3(a)(1) includes in the term "exchange." The logic of this approach apparently is that only the rules of an SRO are subject to a filing requirement, and the rules of a facility are not rules of an SRO unless that facility is part of an SRO. We therefore go on to analyze whether the Wireless Connections are the type of facility Section 3(a)(1) describes as being part of an exchange, without deciding whether SEC jurisdiction depends upon this analysis.

In its Final Order, the SEC concluded that the Wireless Connections do indeed come within the statutory definition of the term "exchange." Section 3(a)(1) defines an "exchange" as "any organization, association, or group of persons . . . which constitutes, maintains, or provides a market place or facilities for bringing together purchasers and sellers of securities or for otherwise performing with respect to securities the functions commonly performed by a stock exchange." The statute then specifically provides that an exchange "includes . . . the market facilities maintained by such exchange." 15 U.S.C. 78c(a)(1). Although the Wireless Connections are provided and maintained by IDS, and not by the Exchanges themselves, IDS and the Exchanges form a "group of persons" that together "maintains or provides a market place or facilities." Therefore, the SEC concluded, the Wireless Connections come within the definition of an exchange in Section 3(a)(1).

We agree. Whatever the outer bounds of the undefined term "group," it certainly includes closely connected corporate affiliates such as the IDS companies and the Exchanges. If it did not, then a party would itself be able to elude SEC jurisdiction by making simple changes to its corporate structure, an obviously untenable result.

We do not suggest the term "group of persons" is synonymous with corporate affiliation. Unaffiliated entities

engaged in joint ventures or other concerted activity may or may not, depending upon the circumstances, be considered a "group of persons" for the purposes of this statute. On the other hand, one corporation that is affiliated with but not controlled by another may or may not, depending upon the circumstances, be considered a "group of persons" for the purposes of the statute. Whether two or more persons are or may be acting in concert is likely the key consideration. These, however, are possibilities we need not confront in the present case.

At any rate, corporate affiliation is significant here. Even putting aside that one of the three companies collectively referred to by the parties as IDS is a subsidiary of an exchange, viz., the NYSE, *see* Figure 1 above, the record reveals a unity of interests between IDS and the Exchanges. According to the original proposal submitted by the Exchanges, that is, prior to the amendments made in response to concerns about the private pole next to the NYSE's facility in Mahwah, the Wireless Connections would have provided IDS, a corporate affiliate of the Exchanges, with an insuperable latency advantage over its competitors. Thus, overlooking corporate affiliation here would allow a company that controls an exchange to evade SEC oversight by making a simple change to its corporate structure; it could then use its control over access to exchange facilities to gain a competitive advantage for its subsidiary, which would be directly at odds with one purpose of the Exchange Act, viz., to prevent the imposition of unnecessary burdens upon competition. *See* 15 U.S.C. 78f(b)(8). All this leaves no doubt that the Exchanges and IDS clearly are a "group of persons" under Section 3(a)(1).

In short, the outer boundary of the term "group of persons" remains murky, and vigilance is necessary to ensure the term is not stretched too far. Whatever the limits of that term may be,

though, corporate affiliates such as IDS and the Exchanges are surely well within them.

In its Reply Brief, however, ICE argues Section 3(a)(1) cannot possibly apply to the Wireless Connections because the statute speaks about "facilities for bringing together purchasers and sellers of securities," which ICE maintains means facilities that directly connect purchasers and sellers of securities. As ICE conceded at oral argument, however, under that reading of the statue the Wireless Connections would not be subject to SEC jurisdiction even if provided directly by the Exchanges. Oral Arg. Rec. at 24:06-25:45. That cannot be right.

As mentioned before, Section 3(a)(2) instances a stock "ticker" as a "facility" even though a ticker merely transmits stock quotes and does not directly bring together purchasers and sellers of securities. Moreover, ICE wisely concedes that sale of proprietary market data is subject to the jurisdiction of the SEC as a "facility of an exchange," but that concession is difficult to square with ICE's reading of the statute, for a proprietary market data feed does not directly connect purchasers and sellers of securities. For similar reasons, ICE's reading of the statute is also difficult to square with the SEC's unchallenged jurisdiction over co-location services. The SEC has regulated co-location services at Mahwah since they were first offered in 2010, *see* Self-Regulatory Organizations; New York Stock Exchange LLC; Order Approving a Proposed Rule Change Amending Its Price List to Reflect Fees Charged for Co-Location Services, 75 Fed. Reg. 59310 (Sept. 2010), and given the centrality of those services to trading strategies on a modern securities exchange, it is difficult to accept a reading of the statute that would place them beyond regulatory purview of the Commission.

Obviously, then, the statute does not limit a facility of an exchange to things that directly bring together purchasers and sellers of securities. Possibly the statute describes what the group must do as a whole, not what each and every part of the group must do. Alternatively, by speaking of "facilities *for* bringing together etc.," and not of "facilities *that* bring together," the statute could be limited to facilities that are maintained *for the purpose* of bringing together purchasers and sellers of securities. Either way, however, the Wireless Connections are covered: IDS is part of a group that directly brings together purchasers and sellers of securities and it offers the Wireless Connections for the purpose of bringing together purchasers and sellers of securities.

In sum, the Wireless Connections come within the definition of "facility" in Section 3(a)(2) and are the type of facility – a market facility maintained by an exchange for bringing together purchasers and sellers of an exchange – that Section 3(a)(1) brings within the term "exchange." Therefore, the SEC correctly concluded that the fee schedules for the Wireless Connections are "rules of an exchange" and hence must be filed with the Commission.

## B. Failure to Consider Effect Upon Competition

ICE contends the Final Order was arbitrary and capricious because the SEC failed to consider whether the Order would "promote efficiency, competition, and capital formation." *See* 15 U.S.C. § 78c(f). Although the Final Order thoroughly discusses the effect the proposed rules would have upon IDS's competitors, it did not, ICE maintains, respond to the argument that subjecting the Wireless Connections to SEC oversight would hamper IDS's ability to compete efficiently.

As the SEC correctly points out, however, this argument conflates two distinct questions: (1) whether an organization is one the Congress decided ought to be subjected to the rule-approval process, and (2) whether the SEC ought to approve a particular rule proposed by an SRO. The provision ICE cites in support of its argument deals with the latter question, as it speaks of the SEC's duties "in the review of a rule of a self-regulatory organization." *Id.* It is thus of a piece with Section 6(b), which requires that rules of an exchange must "provide for the equitable allocation of reasonable dues, fees, and other charges," "promote just and equitable principles of trade," and not "impose any burden on competition not necessary or appropriate in furtherance of the purposes of [the Securities Exchange Act]." *Id.* § 78f(b)(4), (5), (8).

That the SEC is required to consider all this when reviewing a rule proposed by an SRO has nothing to do with whether that SRO is subject to the rule-approval process in the first place. The SEC is not tasked with deciding whether subjecting an organization to the rule-approval process would burden its ability to compete. That decision was made by the Congress: Because the Wireless Connections satisfy the statutory definitions in Sections 3(a) and (b), its rules must be filed with and approved by the SEC — full stop.

## C. Consistency with SEC Regulations and Prior Orders

ICE argues that the Final Order is unlawful because it contradicts SEC regulations defining "exchange." ICE further argues that the Final Order was arbitrary and capricious because it departed from agency precedent without acknowledging and explaining its change of position. These arguments are meritless.

## 1. Consistency with Commission Regulations

An SEC regulation defining the terms used in Section 3(a)(1) provides:

> An organization, association, or group of persons shall be considered to constitute, maintain, or provide "a market place or facilities for bringing together purchasers and sellers of securities or for otherwise performing with respect to securities the functions commonly performed by a stock exchange," as those terms are used in section 3(a)(1) of the Act, (15 U.S.C. 78c(a)(1)), if such organization, association, or group of persons:
>
>> (1) Brings together the orders for securities of multiple buyers and sellers; and
>>
>> (2) Uses established, non-discretionary methods (whether by providing a trading facility or by setting rules) under which such orders interact with each other, and the buyers and sellers entering such orders agree to the terms of a trade.

17 C.F.R. § 240.3b-16(a)(1)-(2). The Wireless Connections do not process orders from buyers and sellers, let alone establish methods for such orders to interact with each other. Therefore, ICE argues, the Final Order ignored this regulation in concluding that the Wireless Connections are subject to the jurisdiction of the SEC as facilities of an exchange.

The cited regulation has no bearing upon this case; it merely describes characteristics an exchange as a whole — that is, the group of persons that together constitute an exchange — must have. Not every part of an exchange, nor every person that is part of a group that constitutes an exchange, must have all these characteristics. That the Wireless Connections lack these characteristics, therefore, does not preclude their being regulated as part of an exchange.

ICE also points to a regulation providing that merely "[r]out[ing] orders to a national securities exchange" does not make something an exchange. 17 C.F.R. § 240.3b-16(b)(1). This is a red herring. The SEC held not that the Wireless Connections are exchanges because they route orders to a national security exchange but that they are included in the statutory definition of exchange because they are part of a group of persons that together perform and facilitate exchange functions going far beyond merely routing orders.

## 2. Departure from agency precedent without adequate explanation

ICE also argues that in concluding the Wireless Bandwidth Connection and the Wireless Data Connection are subject to its jurisdiction, the SEC departed from two agency precedents without providing a reasoned explanation. The first precedent to which ICE points is a 2007 order that dealt with a "neutral communications service that allow[ed] Nasdaq members and non-members to route orders to one another." Self-Regulatory Organizations; The NASDAQ Stock Market LLC; Order Approving a Proposed Rule Change, as Modified by Amendments No. 1 and 2, to Remove Provisions Governing the Operation of the ACES System, 72 Fed. Reg. 46118 (Aug. 2007). The SEC held the system was not a "facility" within the meaning of the Exchange Act: "the . . . system is not linked

with the Exchange's core systems" and "[i]t is not possible for an order to be routed to the Nasdaq Market Center via the . . . system." *Id.* at 46119. The same points, ICE argues, describe the Wireless Bandwidth Connection and the Wireless Data Connection. Therefore, the argument goes, the SEC was obligated to acknowledge the 2007 Order and either follow it or explain its reason for departing from it.

This argument fails because, as the SEC points out, the 2007 Order, which the petitioners never cited in their filings with the Commission, did not purport to set forth a rule that a "facility" must be linked directly to an exchange. The lack of a direct connection was significant in that case because the system under review merely routed orders between broker-dealers, making it easier for them to fulfill their best-execution obligations. Neither of the Wireless Connections involves the mere routing of orders between broker-dealers, so the 2007 Order is simply irrelevant.

ICE's second example of a purported departure from precedent involves a 2008 Order regarding an index dissemination service through which the Nasdaq calculated and disseminated index information based upon publicly available data. Self-Regulatory Organizations; The NASDAQ Stock Market LLC; Order Approving Proposed Rule Change as Modified by Amendment Nos. 1 and 2 Thereto to Remove from Rule 7019 the Fees for Receiving Index Values, 73 Fed. Reg. 66952 (Nov. 2008). Although that service is unlike either of the Wireless Services, ICE points to the following wording in the 2008 Order: "If, however, Nasdaq were to propose to tie pricing for the index dissemination service to exchange services . . . Nasdaq would have to file a proposed rule change with the Commission." *Id.* at 66953. Based upon this snippet, ICE argues the Final Order here under review departed from agency precedent by holding the Wireless Connections are

"facilities" even though their pricing is not in any way tied to "exchange services."

There is nothing to this argument either. In the 2008 Order, having concluded that the index dissemination service was not a "facility," the SEC unremarkably pointed out that the service might be one if the Nasdaq were later to tie its pricing to a service that is a "facility." That has nothing to do with our case, in which the SEC determined the Wireless Connections independently come within the definition of "facility" and are themselves properly characterized as "exchange services."

### III.    Conclusion

We hold that the Wireless Bandwidth Connection and the Wireless Data Connection are subject to the SEC's jurisdiction as "facilities" of an exchange. The SEC therefore correctly concluded that the fee schedules for the Wireless Connections had to be filed with the Commission as "rules of an exchange." This conclusion was consistent with SEC regulations and with agency precedent. For the foregoing reasons, the petition for review is

*Denied.*